UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LINDA STANSBURY,

                            Plaintiff,

    -against-

CHAD WERTMAN,

                            Defendant.

09 Civ. 4638 (RJH)

**MEMORANDUM OPINION AND ORDER**

---

Richard J. Holwell, District Judge:

In this suit under 42 U.S.C. § 1983, plaintiff Linda Stansbury alleges that defendant Chad Wertman, a New York State trooper, violated her constitutional rights by falsely arresting her and initiating a malicious prosecution for petit larceny. Wertman has moved for summary judgment as to both claims. For the reasons set forth below, the motion is DENIED.

## BACKGROUND

The incident for which Stansbury was arrested and prosecuted occurred on the evening of April 4, 2006. On that evening, Mary Sue Cirrincione, a security officer at a Stop & Shop supermarket on Route 6 in Somers, New York, was watching a three inch-by-five inch monitor displaying surveillance footage from around the store. (*See* Def.'s 56.1 Stat. ¶ 3; Pl.'s 56.1 Stat. ¶ 3.) At approximately 8:30, Cirrincione observed a black female who was taking items from shelves and placing them in plastic Old Navy bags in her shopping cart. (*See id.*) The woman was wearing a maroon windbreaker and blue jeans. (*See id.*) Cirrincione alerted Mark John, the head of the store's customer service department, and gave him a description of the woman. (*See* Pl.'s 56.1 Stat. ¶ 3.)

1

However, there is nothing in the record regarding how Cirrincione described the woman to John.

After receiving Cirrincione's call, John went to the aisle where the perpetrator was placing items in the Old Navy bags. (*See id.* ¶ 6.) John later testified that he did not observe the perpetrator's face at that time. (Dec. of R. McLaughlin, Apr. 11, 2011 ("McLaughlin Dec.") Ex. 2. at 175.) John then proceeded to the exit nearest the aisle. (*See* Pl.'s 56.1 Stat. ¶ 6.) When the perpetrator approached the exit, John asked for her receipt, but the perpetrator did not respond. (*See id.*) John later testified that this encounter gave him a view of the perpetrator's face for three to four seconds. (*See* McLaughlin Dec. Ex. 2. at 179.) The perpetrator walked past John, left the store and began fleeing without her shopping cart, stolen items falling from her pocket as she ran. (*See* Pl.'s 56.1 Stat. ¶¶ 6-7.) John and Cirrincione chased after the perpetrator but were unable to apprehend her and the perpetrator fled in a white Econoline van. (*See id.* ¶ 7.) John wrote down the van's license plate number. (*See id.*) Cirrincione called the police. (*See id.* ¶ 8.)

Wertman received the call to respond to the scene. (*See id.* ¶ 9.) Wertman went to the store and interviewed both Cirrincione and John, each of whom also signed a supporting deposition regarding the incident. (*See id.* ¶ 9.) Cirrincione described the woman as "a black female wearing blue jeans and a maroon windbreaker." (McLaughlin Dec. Ex. 5.) John described the woman as "a black woman" who was "wearing [a] maroon colored coat about 5'5" and blue jeans." (*Id.* Ex. 4.) Wertman's notes of his interviews reflect the same general description. (*Id.* Ex. 8. at 3.)

At the store, Wertman and Cirrincione viewed the surveillance tape which Wertman took as evidence. (*See id.* ¶ 10.) Wertman also recorded the license plate number that John had written down. (*See id.* ¶ 8.) However, Wertman was unable to match the number with any vehicles. (*See id.*; Def.'s 56.1 Stat. ¶ 10.) And neither a Peekskill bus ticket nor the perpetrator's jacket nor any other items found in the perpetrator's cart turned up any leads. (*See id.* ¶ 9; Pl.'s 56.1 Stat. ¶ 7.)

The Old Navy bags proved more fruitful. Later the same evening, Wertman decided to visit an Old Navy store further up Route 6 in Mohegan Lake, New York—one of two Old Navy stores in the area. (*See id.* ¶ 11; Def.'s 56.1 Stat. ¶ 9.) At the Old Navy store, Wertman interviewed Jentami Lawson, the store's manager. (*See id.*) According to Wertman's contemporaneous notes of his interview with Lawson and a supporting deposition Lawson completed after Stansbury was arrested, Lawson reported that "a black female" had attempted to make a purchase at around 8:00 p.m. that evening but had her credit card declined. (McLaughlin Dec. Ex. 8 at 3, Ex. 8.) There is no other evidence in the record of how Lawson described the woman or that Lawson had even personally observed her. Lawson also reported that, after 8:00 p.m., one of the store's employees noticed empty shopping bags—which were usually stored in the rear of the store—strewn on the floor at a register near the door. (*See* Pl.'s 56.1 Stat. ¶ 10.) The bags appeared to be identical to those used by the perpetrator. (*See id.*)

Wertman took a copy of the receipt from the transaction in which the woman's credit card had been declined. (*See id.*) Wertman traced the receipt to a MasterCard belonging to one Nicole Stansbury. (*See id.*) After contacting other law enforcement authorities, Wertman identified an address in White Plains, New York and a telephone

3

number for that address under the name of Nicole Stansbury. (*See id.*; Def.'s 56.1 Stat. ¶ 13.)

It appears undisputed that Wertman called the number sometime in the middle of April 2006 and that a woman named Ruth Reynolds answered who told Wertman that Nicole Stansbury was in Texas. (*See* Pl.'s 56.1 Stat. ¶ 12; Def.'s 56.1 Stat. ¶ 13.) It also appears from the record that Wertman was later able to connect with Nicole Stansbury by telephone, at which time she acknowledged being at the Old Navy store on April 4 but stated that she thereafter returned to her mother's home at 592 Panorama Drive in Mohegan Lake. (*See* Def.'s 56.1 Stat. ¶ 12.)

On May 22, 2006, after not hearing from Stansbury for some period of time, Wertman went to the 592 Panorama Drive address. (*See id.* ¶ 13; Pl.'s 56.1 Stat. ¶ 13.) When Wertman arrived, he observed the plaintiff, Linda Stansbury, walk down the stairs to the front door. (*See* Def.'s 56.1 Stat. ¶ 14.) Stansbury then introduced herself as Nicole Stansbury's mother. (*See id.* ¶ 15.) Wertman maintains that he recognized Stansbury as the perpetrator he had seen on the videotape. Wertman proceeded to question Stansbury regarding their whereabouts on April 4. (*See id.*; Pl.'s 56.1 Stat. ¶ 16.) Wertman's notes of the interview reflect that Stansbury was nervous, that she would not answer his questions directly, and that Nicole Stansbury answered many of the questions he asked of her mother. (*See* McLaughlin Dec. Ex. 8 at 4.)

Following his visit to Stansbury home, Wertman obtained a DMV photograph of Linda Stansbury and asked another trooper to prepare a photo array. (*See id.* at 4-5; Pl.'s 56.1 Stat. ¶ 17; Def.'s 56.1 Stat. ¶ 16.) Wertman also scheduled an interview with Linda and Nicole Stansbury at the New York State Police Barracks in Somers on May 30, at

4

which time Cirrincione and John would, if possible, identify the perpetrator.  (*See* McLaughlin Dec. Ex. 8 at 5.)  Prior to the scheduled interview, Wertman reviewed the videotape with his colleagues Jeremy Harrison and Steve Udice.  (*See id.*; Def.'s 56.1 Stat. ¶ 16.)  After comparing the videotape with the DMV photograph, both Harrison and Udice identified the perpetrator as Linda Stansbury.  (*See id.*)

On May 30, Cirrincione and John arrived for the identification but the Stansburys did not.  (*See id.* ¶ 17; McLaughlin Dec. Ex. 8 at 5.)  In lieu of an in person identification, Wertman showed Cirrincione and John the DMV photograph.  Though the New York State Police Field Manual instructed that witnesses should "NEVER" be shown a single photograph of a suspect, Wertman showed Cirrincione and John the DMV photograph and that photograph alone. (*See* Def.'s 56.1 Stat. ¶ 17; Pl.'s 56.1 Stat. ¶ 18; McLaughlin Dec. Ex. 13 at 2-3.)  Both Cirrincione and John identified Stansbury as the perpetrator.  (*See* Def.'s 56.1 Stat. ¶ 17.)   Wertman then contacted Stansbury's lawyer who indicated that Stansbury would report the following day to be arrested.  (*See* McLaughlin Dec. Ex. 8 at 5.)

On May 31, Stansbury reported as scheduled to the police barracks in Somers where she was arrested and charged with one count of misdemeanor petit larceny.  (*See* Def.'s 56.1 Stat. ¶ 18; Pl.'s 56.1 Stat. ¶ 19.)  The arrest information form listed Stansbury's height as 5'9''.  (McLaughlin Dec. Ex. 8 at 1.)

Stansbury was tried in a bench trial in Somers Town Court on March 26 and April 2, 2007.  (*See* Def.'s 56.1 Stat. ¶ 20; Pl.'s 56.1 Stat. ¶ 21.)  The court acquitted Stansbury of petit larceny on April 2, 2007.  (*See* Def.'s 56.1 Stat. ¶ 20; Pl.'s 56.1 Stat. ¶ 22.)

5

## LEGAL STANDARD

Summary judgment is proper if the moving party shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (internal quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A party opposing summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. Proc. 56(e). "Summary judgment in favor of the party with the burden of persuasion, however, is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie,* 526 U.S. 541, 553 (1999). As set forth below, Wertman has the burden of persuasion here with respect to his affirmative defense that he had probable cause—or arguable probable cause—to arrest Stansbury.

## DISCUSSION

### A. False Arrest

#### 1. Governing Law

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996) (internal citation omitted). "To establish this cause of action the plaintiff must show that: (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Posr v. Doherty*, 944 F.2d 91, 97 (2d Cir. 1991) (quoting *Broughton v. State,* 335 N.E.2d 310, 316 (N.Y. 1975), *cert. denied,* 423 U.S. 929 (1975)).

However, "[t]he existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest'" under Section 1983. *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (quoting *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996)). "When an arrest is not made pursuant to a judicial warrant, the defendant in a false arrest case bears the burden of proving probable cause as an affirmative defense." *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010).

"An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jaegly v. Couch,* 439 F.3d 149, 152 (2d Cir. 2006) (internal quotation marks omitted). "When determining whether probable cause exists

courts must consider those facts *available to the officer* at the time of the arrest and immediately before it. . . ." *Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir. 2002) (emphasis supplied). "Because the standard is fluid and contextual, a court must examine the totality of the circumstances of a given arrest." *United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008). And "[t]hese circumstances must be considered from the perspective of a reasonable police officer in light of his training and experience." *Id.*

### 2. Application

Wertman cites six pieces of evidence in arguing that he had probable cause to arrest Stansbury: (1) Cirrincione's and John's eyewitness accounts of the shoplifting; (2) the store surveillance tape; (3) his own identification of Stansbury as the perpetrator on the surveillance tape; (4) Trooper Harrison's and Trooper Udice's opinion that Stansbury's DMV picture matched the perpetrator depicted on the surveillance tape; and (5) Cirrincione's and John's photo identification.

Three of the five pieces of evidence turn on the import of the store surveillance tape. Wertman argues that Stansbury "cannot dispute that the store surveillance tape accurately recorded the shoplifting." (Def.'s Br. at 17.) True enough, but the question is not whether the tape is accurate. Rather, the question is whether the tape is sufficiently clear that there is no genuine issue of fact as to whether Wertman, Harrison, or Udice could have determined that the woman on the tape was the same woman they saw in person or in a picture. As Wertman himself puts it, "the videotape speaks for itself." (Def.'s Reply at 7.)

The Court has viewed the videotape. (Dec. of J. Lee, Mar. 4, 2011 ("Lee Dec.") Ex. G.) Stansbury somewhat overstates the case when she argues that "it is not possible to determine that the perpetrator had distinctive facial characteristics . . . . even when the pause feature is utilized." (Pl.'s Opp'n at 4.) There are several instances on the videotape where the perpetrator's face appears with some definition. However, the perpetrator does not appear with much clarity. And those features that the Court can discern do not so closely resemble the images of Stansbury in the record that a jury would be unreasonable in concluding that the videotape was not "sufficient to warrant a person of reasonable caution," *Jaegly,* 439 F.3d at 152, in concluding that Stansbury was the perpetrator. In that case, summary judgment is unwarranted. *Cf. Dumitrescu v. Hana*, No. 05-CV-72791-DT, 2007 WL 1017324, at * 3 (E.D. Mich. Mar. 30, 2007) ("The actions of the officers are not clear enough on the videotape for the Court to determine that there is no material issue of fact regarding the force used to remove Plaintiff from his vehicle and arrest him.").

It could be that, even if Wertman could not discern the features of the woman on the tape, Cirrincione's and John's descriptions of the woman made him aware of the woman's features. Indeed, both Cirrincione and John have averred in recent affidavits that, on the night of the shoplifting, they "observed that the woman had distinctive facial characteristics, including sunken cheeks and hooded eyes." (Lee Dec. Ex. B ¶ 4; *see also id.* Ex. C. ¶ 3.)

However, as Stansbury points out, neither Cirrincione nor John avers that he or she described those features to Wertman before he arrested Stansbury. Cirrincione avers merely that she "told Trooper Wertman what had occurred and viewed the store

surveillance tape with him." (Lee Dec. Ex .B ¶ 6.) John avers that he "spoke with Tripper Chad Wertman and told him what occurred that night" and "gave him a description of the woman to the best of my ability. . . ." (Lee Dec. Ex. C ¶ 5.) But the record of the deposition John made out to Wertman on the evening of the incident says only that the "person was watched wearing maroon colored coat about 5'5'' and blue jeans." (McLaughlin Dec. Ex. 4). Similarly, Cirrincione's deposition states only that she "witnesses a black female wearing blue jeans and a maroon windbreaker." (McLaughlin Dec. Ex. 5). And Wertman's investigative notes from the day after the shoplifting state only that Cirrincione told him that "she noticed a black female, wearing blue jeans and a maroon colored wind breaker." (McLaughlin Dec. Ex. 8 at 3.)

The absence of contemporaneous evidence that Cirrincione and John described the shoplifter in detail creates a genuine issue as to whether Wertman was aware of anything more than that Cirrincione and John had tried to stop a black female in a maroon windbreaker. That description hardly established probable cause. *Cf. Jenkins*, 478 F.3d at 90 ("It has long been established . . . that when that description could have applied to any number of persons and does not single out the person arrested, probable cause does not exist.").[1]

Wertman counters that "assertions that the 'record' of earlier statements by the eyewitnesses regarding the shoplifter's facial characteristics also fail to create any issues of fact because they fail to controvert that these witnesses immediately identified plaintiff as the shoplifter when Investigator Wertman showed them a picture of her. . . ."

---

[1] Wertman argues that this amounts to "incorrectly surmising that if facts [Cirrincione and John] attest to in their sworn statements were not documented in written form, then it could not have been made available to the officer by other means." (Def.'s Reply at 2-3.) Perhaps that surmise is incorrect, but a jury would not be unreasonable in making it.

(Wertman Reply at 4.)  Stansbury argues that the identifications were too suggestive to support probable cause.  (Pl.'s Opp'n at 14.)

"At the summary judgment stage . . . the suggestiveness of the lineup is determined by reviewing all the facts in the light most favorable" to the plaintiff, "not by reference to the state court's findings."  *Jenkins*, 478 F.3d at 92.[2]  Wertman allows that "the identification procedure used by Trooper Wertman was arguably suggestive. . . ."  (Def.'s Br. at 16. n.2.)  That is hardly surprising given that Stansbury points to the New York State Police Manual which provides that a "photo array procedure consists of showing a witness *an assortment* of photographs, *one of which* is the suspect" and "should consist of only 1 photograph of the suspect and 5 photographs of other people."  (McLaughlin Dec. Ex. 13.)  In fact, the Manual instructs troopers "NEVER show a single photo of a suspect to a witness."  (*Id.*)

"The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned," *Stovall v. Denno,* 388 U.S. 293, 302  (1967), and the Second Circuit has found it proper to exclude evidence of identifications made pursuant to such procedures.  *See, e.g.*, *United States v. Lumpkin*, 192 F.3d 280, 288 (2d Cir. 1999) ("Because the single photo of Williams shown by McMahon to Officers Galie and Sherer-Young during the debriefing session was impermissibly suggestive . . . the trial court properly suppressed this pre-trial identification.") (internal citation omitted).  Such "[s]uggestive procedures are disapproved 'because they increase the likelihood of misidentification. . . .'" *Wray v.*

---

[2] For that reason, Stansbury's citation to the state court record on this issue is immaterial.

*Johnson*, 202 F.3d 515 (2d Cir. 2000) (quoting *Neil v. Biggers,* 409 U.S. 188, 198 (1972)),

It is true that "[e]ven if an identification procedure is unduly suggestive, the out-of-court identification may nonetheless be admissible if other factors indicate that the identification is independently reliable." *Brisco v. Ercole*, 565 F.3d 80, 89 (2d Cir. 2009). However, "[t]o ascertain whether an identification has reliability independent of the unduly suggestive identification procedures, courts generally look to five established factors, first set forth in *Neil v. Biggers* [*supra*]:

> [1] the opportunity of the witness to view the criminal at the time of the crime,
>
> [2] the witness's degree of attention,
>
> [3] the accuracy of the witness'[s] prior description of the criminal,
>
> [4] the level of certainty demonstrated by the witness at the confrontation, and
>
> [5] the length of time between the crime and the confrontation.

*Id.* (citing *Biggers*, 409 U.S. 188, 199-200). Here, these factors cast doubt on the reliability of Cirrincione's and John's identifications. John testified that he saw the shoplifter for only a few seconds (*see* McLaughlin Dec. Ex. 2 at 169:11-17) and there is no evidence that Cirrincione ever saw the shoplifter face-to-face. Cirrincione's and John's later identifications came almost two months after these brief encounters based upon which they described the shoplifter only in general terms as a black female in a maroon windbreaker and blue jeans.

The lack of indicia of reliability only corroborates Stansbury's suggestion that, in the circumstances of this case, showing Cirrincione and John only the DMV photograph could not support probable cause. That makes it impossible for the Court to conclude that a jury would be unreasonable in concluding that Cirrincione's and John's

12

identifications of Stansbury based on a single photo did not give Wertman probable cause.[3]  Indeed, where an officer's assertion of probable cause rests on such a problematic identification, it is error to grant summary judgment.  *See Jenkins*, 478 F.3d at 93 (reversing grant of summary judgment based on claim that witness who identified plaintiff after "the police told him that he had to pick someone out of the lineup" established "arguable" probable cause).  *Cf. Phillips v. Allen*, 743 F. Supp. 2d 931, 941 (N.D. Ill. 2010) ("[A]n unduly suggestive photographic array or in-person lineup may not be used to establish probable cause.").[4]

### 3. Qualified Immunity

That is not the end of the matter, however.  "If facts supporting probable cause to arrest are ultimately found not to have existed, an arresting officer will nonetheless be entitled to immunity from suit based on 'arguable probable cause'. . . ."  *Finigan v. Marshall*, 574 F.3d 57, 61 (2d Cir. 2009).

Arguable probable cause is a species of qualified immunity.  "Under federal law, a police officer is entitled to qualified immunity where (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act."  *Jenkins*, 478 F.3d at 87 (quotation marks

---

[3] Given that Harrison and Udice also only viewed a single photo, the same logic also renders their identification insufficient to support probable cause.

[4] Wertman also points to evidence that, on the night of the shoplifting, Stansbury's daughter, Nicole, had her credit card declined at an Old Navy store where some bags that matched the description of those used by the ship lifter were strewn on the floor.  However, Lawson did not report and there is no other evidence that Nicole Stansbury ever took any bags from the store.  And even if such evidence existed, it would hardly do much to establish probable cause to arrest Linda Stansbury.

omitted).  "There is no doubt that the right to be free from arrest without probable cause was clearly established at the time of [Stansbury's] arrest." *Id.*  "Therefore," her "federal false arrest claim turns on whether [Wertman's] probable cause determination was objectively reasonable." *Id.*

"An officer's determination is objectively reasonable if 'officers of reasonable competence could disagree on whether the probable cause test was met.'" *Id.* (quoting *Lennon v. Miller,* 66 F.3d 416, 423-24 (2d Cir. 1995)).  "'Arguable' probable cause should not be misunderstood to mean 'almost' probable cause.  The essential inquiry in determining whether qualified immunity is available to an officer accused of false arrest is whether it was objectively reasonable for the officer to conclude that probable cause existed." *Jenkins*, 478 F.3d at 87.  "If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Id.* at 87.  Rather, if "on the undisputed facts the officer would be unreasonable in concluding probable cause existed, or if the officer's reasonableness depends on material issues of fact, then summary judgment is inappropriate for . . . federal false arrest claims." *Id.* at 88.

As set forth above, there is a material issue of fact as to whether any eyewitness told Wertman anything more than that the shoplifter was a black female who was wearing a maroon windbreaker and blue jeans.  In similar circumstances, the Second Circuit in *Jenkins* held it error to grant summary judgment on the basis of arguable probable cause.  That case involved allegations that Jenkins was falsely arrested as the second perpetrator of a series of robberies and murders.  "Descriptions of the second perpetrator by

14

witnesses . . . revealed only two characteristics: The second perpetrator was male and black." *Id.* at 89. Though one witness's estimation of the perpetrator's height and weight matched Jenkins's, the Second Circuit held that "these similarities hardly singled Jenkins out as an accomplice in the robbery." *Id.* at 90. And while Jenkins at the time of his arrest "was wearing a shirt that might have been similar to the one [the witness] described," that was "at best a coincidence" and "certainly [did] not establish probable cause" where there was no evidence tying either Jenkins or the other person in the apartment where he was arrested to the crimes being investigated. *Id.* at 90-91.

It is just so here. Drawing all inferences in favor of Stansbury, the most the Court can say is undisputed is that Cirrincione and John told Wertman that the shoplifter was a black female who was wearing a maroon windbreaker and blue jeans. That no more establishes arguable probable cause than the bare bones description in *Jenkins*. In fact, Wertman had even less reason than the officers in *Jenkins* to arrest Stansbury on the basis of eyewitness descriptions because there is no evidence that Stansbury was wearing a maroon windbreaker when Wertman observed her at her home and Stansbury is 5'9'' whereas John described her as 5'5''.[5]

Wertman distinguishes *Jenkins* on two grounds, neither of them persuasive. First, Wertman argues that in *Jenkins* "[t]here was an issue of fact as to whether or not the perpetrators attempted to flee from the officers at the time of arrest. . . ." (Def.'s Reply at 8.) That is true, but it is hard to see how that makes *Jenkins* inapposite. Given the disputed issues of fact, the *Jenkins* court held that the "alleged flight was inappropriately

---

[5] True, Wertman avers that Stansbury had a leather pocketbook that appeared similar to those one used by the perpetrator. But in the circumstances of this case that is no less clearly a "coincidence" than the similarity between Jenkins's shirt and that worn by the perpetrator in the *Jenkins* case. *Jenkins*, 478 F.3d at 90.

15

factored into the district court's analysis" and instead analyzed whether the defendants had established arguable probable cause as a matter of law based on the descriptions of the perpetrator. *Jenkins*, 478 F.3d at 91. The presence of a fact which the *Jenkins* court did not even consider can hardly distinguish that case from this one.

Second, Wertman argues that "Investigator Wertman not only had consistent descriptions of the shoplifter, he had the benefit of a videotape of the crime." (Def.'s Reply at 8.) Also true enough, but the Court has already concluded that the videotape does not depict the perpetrator so clearly that it would be unreasonable to find that Wertman lacked probable cause based on the videotape. To be sure, "arguable" probable cause is also a defense unless "officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause. . . ." *Jenkins*, 478 F.3d at 87. Yet because the videotape is hardly clear, what a jury or an officer would make of it is no clearer for purposes of whether a reasonable officer could have found that Wertman had probable cause than it is for purposes of whether Wertman actually did. That is, the videotape does not make it any more irrational to find that no reasonable officer would have reached the conclusion that Wertman did than to find that Wertman was wrong to draw that conclusion.[6] Accordingly, summary judgment is no more warranted on the basis of "arguable" probable cause than it is on the basis of probable cause.

### B. Malicious Prosecution

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment,

---

[6] Since Harrison's and Udice's identifications also depended on the videotape, those identifications can no more support arguable probable cause than Wertman's can.

16

and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010). "To establish a malicious prosecution claim under New York law, a plaintiff must prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Id.* (quoting *Murphy v. Lynn,* 118 F.3d 938, 944 (2d Cir. 1997), *cert. denied,* 522 U.S. 1115 (1998)).

As the third element suggests, "the existence of probable cause is a complete defense to a claim of malicious prosecution in New York," *Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir. 2003), and Wertman relies on that defense here. However, that defense is unavailing for the reasons set forth above with respect to Stansbury's false arrest claim.

Wertman also argues that summary judgment is warranted because the record is "devoid of any malice on the part of Trooper Wertman" and "the record supports the opposite finding, since prior to meeting plaintiff on May 22, 2006, he did not know of nor had he ever met Linda Stansbury." (Def.'s Br. at 20.)

Wertman is correct that "[s]howing malice under New York law . . . . means that the defendant must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Rounseville v. Zahl*, 13 F.3d 625, 630 (2d Cir. 1994) (quoting *Nardelli v. Stamberg,* 377 N.E.2d 975, 976 (N.Y. 1978)). However, it is also the case that "New York courts recognize that actual malice can rarely be established through direct evidence and thus may be proven though circumstantial evidence." *Rounseville*, 13 F.3d at 630. Hence

"malice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff." *Manganiello*, 612 F.3d at 163 (quoting *Pinsky v. Duncan,* 79 F.3d 306, 313 (2d Cir. 1996)).

"Further, New York law considers the lack of probable cause and the presence of malice closely related," *Rounseville*, 13 F.3d at 631, and "[a] lack of probable cause generally creates an inference of malice."  *Boyd v. City of New York,* 336 F.3d 72, 78 (2d Cir. 2003)*; see also Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir. 1996) ("In most cases, the lack of probable cause—while not dispositive—'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.'") (quoting *Conkey v. State,* 427 N.Y.S.2d 330, 332 (4th Dep't 1980)).  In fact, the Second Circuit has reasoned that a "conclusion that the lack of probable cause presents a jury question likewise suggests that the existence of malice cannot be resolved through summary judgment." *Rounseville*, 13 F.3d at 631; *see also Boyd,* 336 F.3d at 78 ("Once we find an issue of material fact as to probable cause, the element of malice also becomes an issue of material fact as well.").

There is no reason why that is not true in this case, particularly where the evidence suggests that Trooper Wertman employed a photo identification procedure that his own manual warns should "NEVER" be used.   Indeed, Wertman effectively conceded that the probable cause and malice issues are cut of the same cloth when he did not independently contest Stansbury's arguments on this point.  Since there are genuine issues of material fact with respect to probable cause that preclude summary judgment on

Stansbury's false arrest claim, the same issues render summary judgment unwarranted on Wertman's malicious prosecution claim.

## CONCLUSION

For the reasons set forth above, Wertman's motion **[30]** for summary judgment is DENIED.

SO ORDERED.

Dated: New York, New York
       January 24, 2012

                                                                Richard J. Holwell
                                                            United States District Judge